# Exhibit 1

EFiled: Oct 27 2023 04:05PM EDT
Transaction ID 71218585
Case No. 2023-0817-MTZ

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| CAMAC FUND, LP, on behalf of itself and all others similarly situated, | |
| Plaintiff, | **PUBLIC VERSION FILED OCTOBER 27, 2023** |
| v. | |
| PAUL A. WAGNER, LAWRENCE EICHENFIELD, BARBARA K. FINCK, DONALD A. WILLIAMS, STEPHEN K. DOBERSTEIN, STEVEN KORNFELD, SCOTT BRUN and DAVID GRYSKA, | C.A. No. 2023-0817-MTZ |
| Defendants, | |
| and | |
| FORTE BIOSCIENCES, INC., | |
| Nominal Defendant. | |

## VERIFIED AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT

Plaintiff Camac Fund, LP ("Camac" or "Plaintiff"), a stockholder of Forte Biosciences, Inc. ("Forte" or the "Company"), brings this Verified Amended Class Action And Derivative Complaint (the "Complaint")[1] against Paul A. Wagner, Lawrence Eichenfield, Barbara K. Finck, Donald A. Williams, Stephen K. Doberstein, Steven Kornfeld, Scott Brun, and David Gryska (the "Defendants"), in

---

[1]    A comparison to the original complaint is attached as **Exhibit 1**.

their capacities as members of the Board of Directors of Forte (the "Board"), for breaches of fiduciary duties in connection with the Company's most recent annual meeting. The allegations in this Complaint are made upon Plaintiff's knowledge as to itself and, as to all other matters, upon information and belief, including undersigned counsel's review of publicly available information and investigation pursuant to DGCL 220.

## INTRODUCTION

1. This action arises from a "white squire defense" in which Defendants, after multiple other defensive mechanisms proved insufficient to prevent Camac from seating its nominees on the board, orchestrated an enormous private placement that shifted the majority of voting power to a hand-selected group of third parties, fixing the election in favor of management.

2. Forte is a biopharmaceutical company that has failed to develop multiple potential treatments over the years, including most recently FB-401, which the Company abandoned at the end of 2021. Since entering the public markets in June 2020, the value of Forte's stock has declined by 97%.

3. When Forte went public, the Company described itself as a "clinical-stage biopharmaceutical company focused on advancing through clinical trials our lead product candidate, FB-401, which is a live biotherapeutic for the treatment of inflammatory skin disease, including pediatric and adult patients with atopic

dermatitis." After the close of trading on September 2, 2021, Forte announced that FB-401 had failed in Phase 2 of its clinical trials and did not meet the primary endpoint designed to measure its efficacy. The Company's stock price collapsed from a high of $31.47 per share on September 2 to a low of $4.91 the following day.

4.      In the following months, the Company's stock price continued to fall. By late February 2022, the Company's market capitalization was less than $20 million, despite having over $45 million in cash and no meaningful debt.

5.      Rather than explore returning capital to shareholders, Defendants disclosed in May 2022 that they had decided to preserve their positions and "pivot" toward a speculative "proprietary molecule," FB-102, that purportedly might treat one or more "autoimmune related diseases."

6.      To fend off shareholder unrest, the already-staggered Board began implementing additional defensive measures. It announced a rights agreement (*i.e.*, a "poison pill") with a 10% threshold, expanded the size of the Board by two directors (including by adding at least one director with a decades-long relationship to the Company's CEO and incumbent for election in 2023, Defendant Wagner), approved severance agreements with opulent payouts in the event of a change of control, and initiated an at-the-market offering (intended to neutralize unaffiliated voting power), despite that the Company's stock was trading at an enormous

discount to its net cash and the Board had recently stated that it had sufficient cash for at least two years of operations.

7.     In February 2023, Camac nominated two new directors to replace the incumbents standing for reelection at the 2023 annual stockholder meeting, which had not yet been scheduled. Despite the significant dilution caused by the prior at-the-market offering in 2022, Camac's nominees still appeared certain to win the election. The Company's stockholders wanted change.

8.     In response, Defendants did not schedule a meeting within 13 months of the prior annual meeting (in June of 2022), in violation of Section 211 of the DGCL, and began to stall. ███████████████████

███████████████████████████████████████

███████████████████████████████████

9.     In June 2023, the Board disclosed that the 2023 annual meeting would not be held until September 19, 2023—three months after the statutory deadline (the "Annual Meeting"). Then, on August 1, 2023, investors learned why: the Board had entered into a mammoth private securities transaction (the "PIPE")[2] to sell 15.2 million shares of the Company's common stock—*71% of then-outstanding common stock*—to management, including half of the members of the Board, and a hand-

---

[2] Private Investment in Public Equity.

selected group of five institutional investors (the "White Squire Investors"), at least three of which had ties to management.

10.    The Board delayed setting the record date, the critical date determining who is entitled to vote, until *after the offering*, thus allowing the shares acquired by the management and the White Squire Investors to be voted at the forthcoming meeting.

11.    The circumstances, timing, and size of the PIPE make clear that its primary purpose was to tilt the election in favor of Wagner and Eichenfield, ███

████████████████████████████████████████████████

█████████████████████████████████████

12.    ████████████████████████████████████████████

████████████████████████████████████████

13.    Defendants' use of the PIPE to interfere in—and change the result of—a stockholder election is a blatant breach of fiduciary duty under Delaware law. This action seeks to rectify the skewed election results at the 2023 Annual Meeting, obtain damages resulting from Defendants' breaches, and enjoin, on equitable grounds, votes attributable to the PIPE shares from being counted at the 2024 meeting.

## PARTIES

14.    Plaintiff is a Forte stockholder and has owned shares of Forte common stock at all material times alleged in this Complaint.

15.    Defendant Paul A. Wagner is Forte's founder. He is Chief Executive Officer and Chairman of the Board. He has served as a member of the Board as a Class III director since 2020. His prior term expired this year and he stood for reelection at the Annual Meeting. Wagner's total compensation was $5.41 million in fiscal year 2021 and $1.2 million in fiscal year 2022.

16.    Defendant Lawrence Eichenfield has served as a member of the Board as Class III director since 2020. His prior term expired this year and he stood for reelection at the Annual Meeting. Eichenfield's total compensation was $455,072 in fiscal year 2021 and $89,233 in fiscal year 2022.

17.    Defendant Barbara K. Finck has served as a member of the Board since March 2022. She is a Class I director whose term expires in 2024. Finck's total compensation was $99,266 in fiscal year 2022.

18.    Defendant Donald A. Williams has served as a member of the Board since 2020. He is a Class I director whose term expires in 2024. Williams' total compensation was $468,208 in fiscal year 2021 and $103,646 in fiscal year 2022.

19.    Defendant Stephen K. Doberstein has served as a member of the Board since May 2022. He is a Class I director whose term expires in 2024. Doberstein's total compensation was $83,912 in fiscal year 2022.

20.    Defendant Steven Kornfeld has served as a member of the Board since 2020. He is a Class II director whose term expires in 2025. Kornfeld's total compensation was $469,664 in fiscal year 2021 and $107,060 in fiscal year 2022.

21.    Defendant Scott Brun has served as a member of the Board since November 2022. He is a Class II director whose term expires in 2025. Brun's total compensation was $39,430 in fiscal year 2022.

22.    Defendant David Gryska has served as a member of the Board since January 2023. He is a Class II director whose term expires in 2025.

23.    Nominal Defendant Forte is a Delaware corporation and a clinical-stage biopharmaceutical company that trades on the NASDAQ under the symbol "FBRX."

## SUBSTANTIVE ALLEGATIONS

### I.    Forte's Incumbent Directors Destroy Virtually All Stockholder Value

24.    Forte entered the public markets in June 2020 through a business combination with Tocagen Inc.

25.    The Company was initially focused on the development of its lead program, FB-401, a live biotherapeutic for the treatment of inflammatory skin disease.

26.    In September 2021 the Company announced that FB-401 had failed in Phase 2 of its clinical trials by failing to meet the primary endpoint designed to

measure its efficacy. By the end of 2021, the Company's stock price had declined by 85% and was trading significantly below its cash value.

27.    On March 31, 2022, Forte entered into an at-the-market sales agreement (the "At-The-Market Offering") with Ladenburg Thalmann & Co. Inc. through which the Company would have the ability to issue up to $25 million of new common stock to the market, if needed. The Company simultaneously filed a prospectus supplement covering sales of up to $7 million, but it was not clear what the Company would spend the money on, given that it had no current prospects.

28.    To justify its continued existence, the Company pivoted to a new, highly speculative treatment, FB-102. In a May 16, 2022 press release, the Company announced that the Board had determined to "embark on a new path [to] develop novel compounds for the treatment of autoimmune diseases, including potentially graft versus host disease (GvHD), alopecia areata and vitiligo."

29.    FB-102 is an unproven and development-stage treatment concept that is purportedly a "wholly-owned and proprietary molecule that was developed entirely by Forte."

30.    At the time of the pivot to FB-102 (May 2022), the Company reported over $40 million in cash on its balance sheet and stated that "Forte believes [the cash] is sufficient to fund operations for at least the next 24 months."

31.    The Company's market capitalization at the time was *roughly $16 million*, reflecting a 60% discount to the value of the Company's cash.

32.    Given the enormous trading discount of the Company's stock, the entirely speculative value of FB-102, the possibility of additional dilutive offerings, and the Board's track record of obliterating stockholder value, investor response was overwhelming negative.

33.    By the end of May 2022, the Company's stock price had declined by approximately 40% year-to-date and *93% since entering the public markets*.

## II.    The Board Begins To Fortify Against Shareholders

34.    Following the collapse of the Company's stock price, the Board began to focus on diluting and defeating vocal shareholders rather than fixing the Company.

35.    On May 24, 2022, a holder of 8.94% of outstanding shares, BML Capital Management ("BML"), disclosed it had submitted an email to Defendant Wagner stating that the company should liquidate and return cash to shareholders, noting "the company is being run for the benefit of the few remaining employees rather than shareholders."

36.    On June 1, 2022, Forte held its annual meeting of stockholders.

37.    On July 5, 2022, a holder of 7.5% of outstanding shares, Funicular Funds, LP ("Funicular"), disclosed that it had a "frank exchange of views with

9

[Defendant Wagner]. Among other things, [Funicular's principal] Mr. Ma-Weaver requested that the Company publicly disclose additional information about its lead development candidate, including the anticipated cost of preclinical activities, so that shareholders can make their own informed assessment of its prospects. Mr. Ma-Weaver observed current depressed trading levels of the Shares, noted the possibility that the company could meaningfully advance its development program with less than all of its capital, and expressed a preference for the return of capital to shareholders."

38.    Funicular stated its view that the Board, "having determined to proceed with preclinical development, has not yet made an adequate assessment of the potential immediate value creation that could be achieved through a substantial buyback program, tender offer at a premium, or special dividend," and therefore "request[ed], that the Board of Directors evaluate, in conjunction with the Issuer's continued development program, a tender offer or other extraordinary transaction to return $20 million (or such other amount deemed appropriate under the circumstances) and promptly report back to holders."

39.    On July 11, 2022, with no interest in heeding calls to maximize shareholder value, the Board announced a Rights Agreement (i.e., "poison pill") with a 10% threshold.

40.    The Board stated that the Rights Agreement was intended to "render [it] more difficult or discourage a merger, tender or exchange offer or other business combination involving the Company that is not approved by the Board."

41.    On July 19, 2022, Funicular disclosed that its holdings in Forte had increased to 9.9% of outstanding shares. Funicular criticized the aggressive implementation of the poison pill and stated, "[o]ne of the pill triggers is the public announcement of a tender offer; given how deeply discounted [Forte's] securities remain, a 'hostile' party could conceivably offer to purchase [Forte's] entire capital stock at a discount to liquidation value while still offering stockholders a very substantial premium. The Board no doubt feels compelled to substitute its judgment for stockholders' in such a circumstance even though a large proportion of the stockholders might find the offer compelling."

42.    On August 1, 2022, Camac filed a Schedule 13D disclosing beneficial ownership of approximately 7.5% of Forte's outstanding common stock.

43.    On August 4, 2022, another investor, ATG Capital Management, LLC ("ATG") filed a Schedule 13D disclosing holdings of 9.9% of outstanding Forte shares. ATG stated plainly its "dissatisfaction with the strategic direction of [Forte], including without limitation in connection with the Issuer's introduction of its 'poison pill,'" and ATG's intent to "engage in discussions with [Forte's] management, board of directors, other representatives . . . regarding potential

11

alternatives and recommendations that [ATG] believe[s] would present the opportunity for more immediate and certain value creation . . .  eason [ing], without limitation, liquidation of [Forte's] assets and return of capital to the Issuer's stockholders."

44.    On August 9, 2022, Camac amended its Schedule 13D to disclose that it now owned 9.8% of the Company's outstanding stock.

45.    Thus, by August 2022, through four separate 13D filers, Forte's management knew that at least nearly 40% of outstanding shares were held by sophisticated investors that had identified significant flaws and deficiencies in management's conduct and were demanding change.

46.    Shortly thereafter, the Board revealed that it had used the At-The-Market Offering to substantially dilute all unaffiliated stockholders at prices below the net cash per share, including BML, Funicular, ATG, and Camac.

47.    Specifically, on August 15, 2022, the Company disclosed that between July and August it had "issued an additional 5.6 million shares of common stock"— *i.e.*, *roughly 38% of then-outstanding shares*—"for gross proceeds of approximately $7.0 million." Prior to the offering, there were 14.8 million shares outstanding.

48.    While the Board suggested that the purpose of the Company's offering was to "further strength[en] its balance sheet," the Company continued to hold roughly $40 million in cash and had stated *only three months earlier* in May 2022

that it had "sufficient cash for at least the next 24 months." The Board had, of course, incorporated "research and development costs" into that projection, including costs relating to "preclinical studies" and "clinical trials."

49.    Indeed, during Board meetings in March 2022 and May 2022, the Board had specifically reviewed and discussed the Company's "cash runway projections," including an "estimate of the cash balance as of the end of 2022," but did not conclude that additional cash was needed for the Company's foreseeable operations.

50.    When the Board met on August 11, 2022, it abruptly changed course, stating now that it would "need to raise additional capital ███████████████████ ████ to continue to pursue development of FB-102," purportedly because of "increases in cash utilization due to ████████████████████████████ ███████████████████████████████"

51.    During the August meeting, the Board also notably discussed "current ownership and the on-going demands from certain shareholder activists to liquidate the Company." But the Board cursorily determined that "it would not be in the stockholders' best interests to return capital or dissolve the Company at this time and the best use of the Company's available capital to maximize stockholder value is to continue development of FB-102."

52.    The minutes from the August 2022 meeting do not include any further discussion of the Board's purported analysis. The Board did not retain outside

advisers or even their own counsel with respect to the determination not to liquidate, nor did it ask for a presentation or analysis from management or interested shareholders.

53.    In any event, following the announcement of the At-The-Market Offering in August 2022, management unequivocally advised the Board that "the Company has at least a 24-month cash runway following the recent [at-the-market] financing transactions." This included cash necessary for "clinical trials," which the Company had been forecasting as early as its first Form 10-Q (on May 16, 2022) following the pivot to FB-102.

54.    On August 18, 2022, Camac filed an amendment to its Schedule 13D disclosing beneficial ownership of approximately 7.1% (as it had been significantly diluted by the At-The-Market Offering). Camac stated plainly its "concern regarding the Board's decision to issue a substantial number of shares of Common Stock, thereby diluting the number of shares of [Camac] and other holders," and its intention to "take action against the Board if necessary."

55.    On August 26, 2022, Camac served the Company with a demand pursuant to Section 220 of the Delaware General Corporation Law seeking to inspect books and records relating to mismanagement at the Company and the suitability of the incumbent directors.

56.    On September 28, 2022, Camac filed an amendment to its Schedule 13D disclosing beneficial ownership of approximately 8.2% of Forte's outstanding common stock.

57.    On October 20, 2022, the Company agreed to produce (subject to heavy redactions) certain minutes and written actions of the Board, D&O Questionnaires, and stockholder list materials.

58.    On November 14, 2022, the Board disclosed that it was expanding its size by unilaterally appointing Defendant Brun to a three-year term as a Class II director. Brun was not nominated by any shareholder of the Company.

59.    The Board also disclosed that it had adopted generous severance agreements with the Company's officers in the event of a change in control. These were designed solely to discourage the termination of current management, protect current management if the incumbent Board were to be replaced, and ingratiate current management to the incumbent Board notwithstanding contrary stockholder views.

60.    Under the new agreements, if an officer is terminated following a change in control of the Company, the officer is purportedly entitled to:

- A lump sum cash payment equal to 150% of such executive's base salary as in effect immediately before such termination, or 200% in the case of the Chief Executive Officer;

- A lump sum cash payment equal to 150% of such officer's target bonus opportunity, or 200% in the case of the Chief Executive Officer, as in effect immediately before such termination or the applicable change in control, if greater;

- Company payment of the premiums required for continued coverage pursuant to COBRA under the Company's group health, dental and vision care plans for the executive officer and his or her eligible dependents for up to 18 months, or 24 months in the case of the Chief Executive Officer; and

- 100% accelerated vesting and exercisability of the outstanding and unvested Company equity granted to the executive.

61.    The severance agreements were intended solely to further entrench current management and consolidate the Board's resistance to stockholder demands.

62.    On November 23, 2022, Camac filed a Section 220 complaint in this Court after the Company failed to produce documents sufficient to satisfy its inspection demand.

63.    By the end of 2022, the Company's stock price had declined by 52% for the year and 94% since entering the public markets.

### III.    The Board Increases Its Defensive Efforts
### In Advance Of The 2023 Annual Meeting

64.    In advance of the 2023 meeting—at which Defendant Wagner, Forte's CEO, and Defendant Eichenfield (the "Incumbent Nominees") would stand for reelection—the Board began to take further defensive measures to ensure its control over the Company, in addition to its prior dilutive issuances contrary to stated cash needs, adoption of the poison pill, expansion of the board, and granting of generous severance packages to management as discussed above.

65.    On January 10, 2023, the Board disclosed that it was increasing its size again, as a further defensive measure, by unilaterally appointing Defendant Gryska to the Board. Gryska has a more-than-20-year relationship with Defendant Wagner, according to the Company's press release.

66.    As a result of the addition of Defendants Brun and Gryska, the incumbent directors positioned themselves to maintain control of the Board even if they lost directors elections in the 2023 and 2024 stockholders' meetings. Prior to the expansion of the Board, the incumbent directors stood to lose control of the Board by the 2024 meeting.

67.    On February 17, 2023, Camac delivered a nomination notice to the Company nominating two highly qualified persons to the Board, Michael G. Hacke and Chris McIntyre (the "Camac Nominees"). Both have substantial track records of profitable business endeavors as well as capital allocation expertise.

68.    Mr. Hacke founded Steel City Capital, which operates a value-oriented investing strategy. Before that, he was a Vice President at Macquarie Infrastructure and Real Assets, a global asset manager; an Assistant Vice President of Equity Research at Barclays plc, a global financial services provider; and an Analyst in the Credit Risk Management department of Morgan Stanley, a multinational financial services firm. Mr. Hacke is a CFA charterholder and holds a B.A. in Political Science from the Pennsylvania State University.

69.    Mr. McIntyre founded McIntyre Capital Management, an investment firm that makes concentrated investments in value-oriented equity and debt securities. Before that, he was a Managing Director at MAK Capital, an investment fund focused on value equity and distressed debt; a Senior Analyst and Sector Head at Cobalt Capital, a multi-stage investment firm; a Senior Analyst at MDR Capital, a provider of investment advisory services; and an analyst and portfolio manager at FNY Securities. Mr. McIntyre is a CFA charterholder and holds a B.A. in Economics and Government from the University of Virginia.

70.    Given the shareholder base at the time, Camac appeared virtually certain to defeat the Incumbent Nominees at the forthcoming Annual Meeting, presumably in June or July 2023 (*i.e.*, within 13 months of the 2022 meeting), and thus began to engage with management.

71.     On March 8, 2023 and March 9, 2023, Camac's counsel held calls with the Company's counsel in an attempt to reach an agreement that would avoid the cost and disruption of a contested meeting.

72.     The Board refused, at all times, to speak directly with Camac. Through counsel, Camac suggested multiple potential frameworks to reach an agreement, including, among others, ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

73.     The Company refused to discuss further, or engage directly, and continued to ignore the legitimate demands of large stockholders, ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

74.     On March 15, 2023, Camac reached out directly to Defendant Wagner in an effort to speak directly or reach a compromise, but Defendant Wagner never responded to the invitation to speak.

75.    On May 15, 2023, the Company announced Q1 2023 results, and stated that it "believes that its current cash available will enable it to fund its operating expenses and capital expenditure requirements through *at least twelve months*." Forte knew, at this time (and certainly earlier), that its "future capital requirements" included "clinical trials for our product candidates," but still projected cash on hand sufficient for at least a year.

76.    Thereafter, Camac continued to make its case for change at the Company. In a proxy statement, Camac stated, "management and the Board have a track record of value destruction, are pursuing value destructive initiatives, and are disregarding stockholders' interests. In order to protect the Company and stockholders from the continued destruction of value, we believe Board change is necessary."

77.    The evidence compiled by Camac was overwhelming and was virtually uncontested by management:

**Track record of value destruction**: Since the closing of the [predecessor] Company's initial public offering in April 2017, the share price has declined approximately 99% and the Company has accumulated losses of $93.8 million since inception.

**Value destructive initiatives**: We believe the Company's recent pivot to focus on the development of FB-102, its therapeutic molecule that could potentially be used as a treatment for autoimmune diseases, is early-stage, highly speculative, and an effort by management to keep their jobs rather than create value for stockholders.

In addition, we believe the Company's decision to issue shares of Common Stock below net cash value in 2022 is incomprehensible and shows a total lack of understanding of capital allocation. The shares of Common Stock continue to trade at a large discount to net cash value, and we believe that this value opportunity will be eroded if the current leadership is not changed.

**Disregarding stockholder interests**: Despite significant concerns and adverse reactions from the market, including four Schedule 13D filers, regarding the Company's current strategy and widespread interest from stockholders for the Company to abandon its current strategy and return capital to stockholders, the Company seems content to disregard the views of stockholders – the true owners of the Company – and maintain the status quo.

Furthermore, not only is the Company's current leadership dismissive of the views of its stockholders, it appears they are unwilling to even engage with stockholders. We have been approached by numerous significant stockholders, all of whom indicated that management has been unwilling to speak with them. Unfortunately, it seems as though management believes the Company is theirs to do as they please and they don't have to answer to stockholders.

**Board change is necessary**: We are soliciting votes to elect our two Nominees to the Board, which is the maximum number of seats available at the Annual Meeting due to the classified structure of the Board that serves to insulate the incumbents and reduces accountability. We believe our Nominees are highly skilled at capital allocation and will work to maximize value for all stockholders. We further believe that the removal of the two incumbent directors, particularly CEO Dr. Wagner, is critical to send a clear message to the Company's leadership that the status quo is not acceptable and stockholders demand a change in direction.

**A better path forward**: In light of the issues we have summarized herein and our unsuccessful attempts at engaging constructively with the Board, we have nominated our Nominees in an effort to put directors on the Board that will prioritize the best interest of stockholders and work tirelessly to effect a strategy that includes the return of capital to stockholders. If elected, the Nominees will represent

a minority of the members of the Board, and therefore it is not guaranteed that they will be able to implement any actions that they may believe are necessary to enhance stockholder value, however, a vote for our candidates is a vote for abandoning the current plan and returning capital to stockholders. Further, voting for our Nominees will serve as a referendum to management and the Board as to what stockholders believe is the right path forward for the Company.

## IV.    In A Last-Ditch Effort To Fend Off Camac's Nominees, The Board Issues Millions Of New Shares To Third Parties

78.    Despite having held its prior annual meeting in June 2022, the Board did not announce or hold a meeting date in June or July 2023, in violation of DGCL 211, which requires subsequent meetings to be held within 13 months.

79.    The Board provided no public explanation for its delay. But, behind the scenes, the Board was negotiating a lifeline that would fundamentally alter the Company's shareholder base and give it a chance of success, if not guarantee success, at the forthcoming Annual Meeting.

80.    On June 26, 2023, the Board disclosed in a Form 8-K that the Company had renewed and extended its poison pill through July 12, 2024, which was previously set to expire in July 2023.

81.    It also finally disclosed a date for the 2023 Annual Meeting— September 19, 2023 (*i.e.*, *fifteen months* after the prior year's meeting). The Board again provided no explanation for the delay, and, notably, did not set a record date.

82.    On August 1, 2023, the Board disclosed that the Company had entered into the PIPE to sell 15.2 million shares of common stock and 9.7 million warrants

to purchase common stock to (i) members of management, including Defendants Wagner, Gryska, Kornfeld and Williams (*i.e.*, four of the eight-person Board); and (ii) the White Squire Investors, including Fred Alger Management ("Alger"), BVF Partners ("BVF"), Farallon Capital Management ("Farallon"), Perceptive Advisors ("Perceptive"), and Tybourne Capital Management ("Tybourne"):

| Offering Participant | Shares Acquired |
|---|---|
| Tybourne | 3,624,548 |
| Perceptive | 3,265,359 |
| BVF | 2,982,105 |
| Farallon | 1,810,455 |
| Alger | 1,192,842 |
| Defendant Wagner | 247,524 |
| Defendant Gryska | 148,514 |
| Defendant Kornfeld | 99,009 |
| Defendant Williams | 59,405 |

83.    Subsequently, the Board set the record date for August 10, 2023, to allow management and the White Squire Investors to vote the new shares in the forthcoming Annual Meeting.

84.    The PIPE sale price as to common stock was $1.006 per share and the warrants could be exercised to purchase common stock at $1.005—*i.e.*, both an *approximately 40% discount* to the value of the Company's cash and a substantial discount to net cash, given the Company's limited debt. At the time of the PIPE, the

23

Company had 21,051,195 outstanding shares and $35.9 million in cash (*i.e.*, $1.70 per share in cash).

85.    An offering at a discount of that magnitude is virtually unprecedented (and nonsensical). In proxy materials, the Company weakly suggested two comparable offerings involving Gossamer Bio and Evelo Biosciences, but blatantly misrepresented the terms of those offerings, which were not discounted in reality.

| Company Name | Gossamer | Evelo Biosciences |
|---|---|---|
| Ticker | GOSS | EVLO |
| Cash per Share (Last 10Q/K prior to transaction) | $2.13 | $8.72 |
| Stock Price Ave (5 day prior to transaction date) | $1.60 | $2.87 |
| **Pre-transaction Stock discount to CPS** | **25%** | **67%** |
| | | |
| Transaction announced | 20-Jul-23 | 10-Jul-23 |
| Amount raised ($ m) | $212 | $25.5 |
| Market cap (5 day prior to transaction date) ($ m) | $143 | $15.7 |
| Raise amount vs market cap | 149% | 162% |
| | | |
| **Terms** | | |
| Price per share of transactoin | $1.63 | $2.19 |
| Share price day before announcement | $1.82 | $2.31 |
| **Discount of transaction price to day prior announcement** | **10%** | **5%** |
| **Warrant coverage** | **25%** | |

86.    The chart published by the Company relied on financials for Gossamer and Evelo that were nearly a year old and inaccurate, and concealed that both of those companies (unlike Forte) had negative net cash (more debt than cash).

87.    At the time of its July 2023 offering, Gossamer had considerable debt that exceeded available cash by $81 million and therefore had negative net cash.

88.    Likewise, as to Evelo, that company's debt exceeded its cash by approximately $58 million at the time of its July 2023 offering and therefore it also

had negative net cash. As to cash per share, Evelo's offering was actually conducted at a premium of 161%.

89.    Thus, neither purportedly comparable offering was conducted at a discount anywhere near Forte's PIPE, which makes no financial sense for any company, much less one like Forte, which lacks a proven treatment and a clear path to profitability. There was no conceivable motive to raise capital at a discount to the net cash per share on the balance sheet other than for entrenchment purposes, and doing so effectively gave away any upside from business prospects, suggesting a negative implied value of operations.

90.    Not only were the transactions not analogous, both Gossamer and Evelo have treatments in much deeper stages of trials and development, and thus were raising capital to bring these treatments to the finish line. Forte's treatment is mere speculation by a management team that already has destroyed all shareholder value in the Company.

91.    The PIPE was a tremendous windfall for the White Knight Investors—as well as management and members of the Board, who capitalized on the opportunity to participate (without offering the opportunity to other stockholders)—because they were provided an exclusive opportunity to purchase a pro rata share of $35 million in cash for *60 cents on the dollar*, with the additional upside if the Company's speculative treatment is ever worth something someday.

92.     For inexplicable reasons (other than entrenchment, and/or to alter the voting results), no other unaffiliated shareholders were permitted to participate in the PIPE, nor did the Board conduct a process to ensure that the Company obtained the highest and best price.

93.     It was not difficult to see that the PIPE would flip the results of the Annual Meeting. The new shares constituted *over 71% of then-outstanding common stock entitled to vote*, profoundly altering the Company's capital structure and diluting the voting power of all unaffiliated stockholders.

94.     While the Board claims not to have entered into formal, written voting agreements with the White Squire Investors (because doing so would have sealed its liability in this action), management hand-selected the participants in the PIPE knowing that doing so had a high certainty of altering the outcome of the vote and tipping the vote in favor of the incumbents. ██████████████████████ ██████████████████████████████████████

95.     The Board had good reason to expect the PIPE to tip the election. The pricing was extremely advantageous to the White Squire Investors, who were effectively given a highly protected option on future prospects, if any. Alger and BVF had been early-stage investors in Forte when Forte was a private company, and thus were friendly with management and could be expected to vote in favor of the Incumbent Directors. Perceptive also had invested in Forte in late 2020 and the first

half of 2021, shortly after it became a public company, and previously had been an investor in Pfenex Inc. during the period Defendant Wagner was that company's Chief Financial Officer from 2014 to 2017.

96.     While the other White Squire Investors do not appear to have a public history with management, they were hand-selected by Defendant Wagner (an incumbent nominee) without the use of a financial adviser and based on Mr. Wagner's personal and undisclosed preferences. And, given their price of entry, they were incentivized only to roll the dice on management.

97.     On August 2, 2023, the Company filed a preliminary proxy statement for the September 19, 2023 Annual Meeting (the "Proxy").

98.     To utilize the PIPE in the forthcoming election, the Board set the stockholder record date as August 10, 2023—*i.e.*, just after the closing of the PIPE—permitting the White Squire Investors to vote their newly acquired shares.

99.     With the election tipped in their favor, management made little effort to justify the Company's poor performance, counter Camac's arguments in support of its nominees, or address the Board's conduct with respect to the PIPE.

100.    At best, the Board stated that the Camac Nominees purportedly "have never held a position at a biotechnology company, have no medical background and have no prior public company board experience," and that the "Board believes their

presence in the boardroom would be destructive rather than constructive." The Proxy contains no support whatsoever for these contentions.

101.   On August 4, 2023, the Company disclosed that its "current independent registered public accountant . . . would not stand for re-appointment for the fiscal year ending December 31, 2024 [and] will cease to serve as the Company's independent registered public accountant." The Board provided no additional information about the circumstances of the auditor's withdrawal.

**V.    Camac Files Suit But Continues To Campaign For Its Nominees**

102.   On August 10, 2023, Camac initiated this action asserting breach of fiduciary duty claims and seeking expedited proceedings *prior to the vote* to bar the newly issued PIPE shares from participating in the election.

103.   At an August 17, 2023 hearing on Camac's motion for expedition, the Court granted expedition but declined to set a schedule for resolution of the matter prior to the September 19, 2023 Annual Meeting.

104.   Following the ruling, Camac continued to campaign for its nominees, including by seeking a dialogue with each of the White Squire Investors.

105.   All White Squire Investors, except for Farallon, refused to even engage with Camac regarding its position. Farallon did agree to a call, resulting in an open dialogue regarding the Company's condition and purported prospects.

106.  In light of the ongoing discussions with Farallon and Camac's continued efforts to try to arrange meetings with the other White Squire Investors, Camac agreed on September 7, 2023 to stay this action pending the results of the election.

107.  Although the PIPE had, by design, drastically swung the probability of election in favor of the Incumbent Directors, Camac continued to campaign diligently in the hopes of winning in any event and avoiding future litigation.

108.  Despite repeated outreach, however, Alger, BVF, Perceptive, and Tybourne ultimately refused to even accept a call from Camac.

109.  On September 13, 2023, ISS issued a Proxy Analysis & Benchmark Policy Voting Recommendation in favor of Camac's nominee, Michael Hacke, and highly critical of the Board's entrenchment and mismanagement. ISS stated:





(Emphasis added.)

110.   Likewise, on September 19, 2023, Glass Lewis issued a Proxy Paper recommending that shareholders vote in favor of both of the Camac Nominees, and against the Incumbent Nominees, because of the Company's poor performance and management's entrenchment. Glass Lewis stated:



*Given the Company's poor performance, track record of value destructive actions and apparent attempts to entrench incumbent leadership and undermine shareholder rights, we believe the removal of both* <u>*Management Nominees from the board is warranted*</u>. In our view, Mr. Wagner, as chairman and CEO of the Company, holds particular responsibility for the Company's poor performance and failure to address shareholder concerns.



Furthermore, given our views that the Company's shareholder rights plan is not in the best interests of shareholders, we believe it would   easonable for shareholders to also support both of the shareholder proposals (Proposals 6 and 7), which the Dissidents also support. (Emphasis added.)

111.    Notwithstanding these endorsements of the Camac Nominees, and ultimately the votes of unaffiliated shareholders, the PIPE had already determined the election's outcome.

## VI.    The PIPE Swings The Election In Favor Of The Incumbent Directors

112.    The Company held the Annual Meeting on September 19, 2023. Of the 36.2 million shares allowed to vote in the election, 15.2 million had been issued in the PIPE—*i.e.*, 42% of outstanding shares. The results, according to the Report of the Inspector of Election (First Coast Results, Inc.), were as follows:

Lawrence Eichenfield, M.D.

FOR                              WITHHOLD

16,396,500                       11,097,526

Paul A. Wagner, Ph.D.

FOR                              WITHHOLD

16,831,738                       10,662,288

Camac Nominees:

Chirs McIntyre

FOR                              WITHHOLD

10,627,041                       16,348,276

Michael G. Hacke

FOR                              WITHHOLD

11,064,021                       15,911,296

113.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

| White Squire Investor | Votes In Favor Of Incumbents |
|---|---|
| ████ | ████ |
| ████ | ████ |
| ██ | ████ |
| ██ | ████ |
| ██████ | ██ |
| ██████ | ██ |
| ██████ | ██ |
| ██████ | ██ |

114.   Of the approximately 16.4 million votes for incumbent Eichenfield and the 16.8 million votes for incumbent Wagner, ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

115.   But for the PIPE, Camac would have won by a landslide. ████████████

████████████████████████████████████████████

████████████████████

| Nominee | Voting Results With PIPE | Voting Results Without PIPE |
|---|---|---|
| Lawrence Eichenfield | ██████ | █████ |
| Paul A. Wagner | ██████ | █████ |
| Chris McIntyre | ██████ | █████ |
| Michael Hacke | ██████ | █████ |

116.   On September 20, 2023, the Company announced preliminary results suggesting that the Incumbent Nominees had been elected. On September 26, 2023, the Company announced "final voting results" suggesting that the Incumbent Nominees were "elected to serve as Class III directors, to hold office until the

Company's 2026 annual meeting of stockholders or until his respective successor is duly elected and qualified."

117.    Forte's shareholders also voted on a precatory proposal submitted by Funicular requesting the Board to take all steps necessary to terminate the existing poison pill. Both ISS and Glass Lewis recommended that shareholders vote in favor of Funicular's proposal, with Glass Lewis specifically noting concerns of an "Entrenched board." Nevertheless, the proposal was rejected by a vote of 14,525,586 against and 11,096,793 for. █████████████████████████████████
████████████████████████████

118.    By the end of September 2023, Forte's stock price had declined by approximately 98% during the prior two calendar years.

## CLASS ACTION ALLEGATIONS

### (As to Count I)

119.    Plaintiff brings Count I pursuant to Rule 23 of the Rules of the Court of Chancery of the State of Delaware individually and as a class action on behalf of all similarly harmed Forte investors (the "Class").

120.    The Class includes all holders of common stock as of the record date of August 10, 2023 who were entitled to vote in the September 19, 2023 Annual meeting, excluding participants in the PIPE and Defendants named herein, and any

person, firm, trust, corporation, or other entity related by blood or marriage to or affiliated or associated with any of the Defendants or their successors in interest.

121.    The members of the Class are so numerous that joinder of all members is impracticable.

122.    There are questions of law and fact common to the Class, which predominate over questions affecting any individual Class member, including whether Defendants breached their fiduciary duties by interfering in the election of directors at the Annual Meeting and the harm to the stockholder franchise.

123.    No difficulties are likely to be encountered in the management of this case as a class action.

124.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

125.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of other Class members and Plaintiff has the same interests as other Class members. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

126.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to

individual members of the Class, which would establish incompatible standards of conduct for Defendants or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

127.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## <u>DERIVATIVE ALLEGATIONS</u>

### (As to Count II)

128.   Plaintiff brings Count II derivatively in the right and for the benefit of the Company.

129.   Plaintiff has owned shares of Forte continuously at all relevant times set forth herein and will adequately and fairly represent the interests of Forte in enforcing and prosecuting its rights. Plaintiff has retained counsel experienced in prosecuting this type of derivative action.

130.   Plaintiff has not made, and is excused from making, a pre-suit demand on the Board pursuant to *United Food and Commercial Workers Union v. Zuckerberg*, No. 404 2020, 2021 WL 4344361 (Del. Sept. 23, 2021).

131.   Four of the eight members of the Board—Defendants Wagner, Gryska, Kornfeld and Williams—directly participated in the PIPE and purchased discounted

shares from the Company in a transaction they negotiated without outside advisers, independent counsel, or an independent committee, resulting in enormous dilution and harm to the Company and its unaffiliated stockholders, who were barred from participating. Therefore, these Board members "received a material personal benefit from the alleged misconduct that is the subject of the litigation demand" and cannot properly consider a demand. *Id.*

132.    Defendants Wagner and Eichenfield were both incumbents standing for election at the Annual Meeting and therefore also "received a material personal benefit from the alleged misconduct that is the subject of the litigation demand" as a result of the PIPE tipping the election in their favor and preserving their prestige and compensation associated with his position.

133.    Defendant Gryska has a more-than-20-year relationship with Defendant Wagner, and therefore "lacks independence from someone who received a material personal benefit from the alleged misconduct."

134.    Finally, all eight Board members negotiated and approved the PIPE in bad faith for purposes of purposes of entrenchment and interference in the stockholder election at the Annual Meeting, and thus face "substantial likelihood of liability on any of the claims that would be the subject of the litigation demand." *Id.*

135.    In light of the above, the Board did not consist of a majority of independent and disinterested directors and pre-suit demand was excused.

# CAUSES OF ACTION

## COUNT I

### Direct Claim For Breach Of Fiduciary Duty

136.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

137.   The Defendants, as current directors, owe Forte stockholders the highest duties of care and loyalty. These fiduciary duties preclude the Defendants from taking action to favor their own interests ahead of the interests of the Company and its stockholders.

138.   The Defendants breached their fiduciary duties by intentionally manipulating the voting results in a contested election, through the PIPE, in favor of the Incumbent Nominees.

139.   Defendants knew that the Incumbent Nominees would lose at the Annual Meeting if held in June or July 2023, and therefore announced a meeting in September 2023 (fifteen months after the prior meeting in violation of DGCL 211).

140.   In the interim, Defendants negotiated the PIPE to drastically dilute all unaffiliated shareholders and shift the *majority of voting power* to the White Squire Investors, a hand-selected group of third parties. Camac and other unaffiliated stockholders were excluded from participation. Defendants then set the record date

after the closing of the PIPE to ensure that the new shares could be voted at the Annual Meeting.

141.  The primary purpose of the PIPE, and the sequencing of the Annual Meeting and record date, was to disrupt the election and tip it in favor of the Incumbent Nominees. The Company had repeatedly stated, as recently as August 2022, that it had sufficient cash for at least two years of operations.

142.  Indeed, because the shares in the PIPE were sold at an enormous discount to the value of the Company's cash, the terms were highly advantageous to the White Squire Investors and the participating members of management, and unfair and detrimental to the Company. In other words, the PIPE was not a favorable form of financing even if the Company did require capital (which is disputed). Rather, Defendants facilitated the PIPE for the primary purpose of achieving the desired side effect of tipping the election results.

143.  Defendants' use of the Company's assets to interfere in a stockholder election constitutes a breach of fiduciary duties.

144.  As a result of Defendants' conduct, Plaintiff and other members of the Class, and the Company have been harmed.

145.  Plaintiff has no adequate remedy at law.

## COUNT II

### Derivative Claim For Wrongful Dilution

146.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

147.   The Defendants, as current directors, owe Forte stockholders the highest duties of care and loyalty. These fiduciary duties preclude the Defendants from taking action to favor their own interests ahead of the interests of the Company and its stockholders.

148.   Defendants breached their duties by negotiating and executing the PIPE in bad faith solely for purposes of entrenchment, wrongfully diluting the value and voting power of all shares held by stockholders unaffiliated with the Defendants or the White Knight Investors. The Company did not genuinely need to raise equity capital at the time of the PIPE, and Defendants failed, in any event, to explore alternative sources—or even timing—of capital that would not have wrongfully diluted stockholders to the extent of the PIPE and interfered in the director election.

149.   Defendants did not make the PIPE available to Plaintiff or other unaffiliated stockholders, and directly participated in it themselves, purchasing shares that were discounted to the value of the Company's cash (and, to a lesser extent, the market price).

150. Defendants caused the dilution for improper purposes—namely, to decrease the voting power of unaffiliated stockholders and cause the reelection of the Incumbent Nominees to solidify the Board's control over the Company.

151. Through the PIPE, Defendants caused the Company to issue shares at an enormous discount to the value of its cash, causing substantial harm to the Company and its stockholders in an amount to be proven at trial.

152. Plaintiff has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

a. Declaring that this action is properly maintainable as a class action and certifying the Class;

b. Declaring that the Defendants breached their fiduciary duties;

c. Declaring that all votes cast attributable to shares acquired through the PIPE shall be excluded from the final voting results of the Annual Meeting;

d. Declaring that the Camac Nominees were validly elected at the Annual Meeting and the Incumbent Nominees were not validly elected;

e.      Ordering the Board to recognize the Camac Nominees as validly elected members and remove the Incumbent Nominees from their positions on the Board;

f.      Ordering the Company to hold an annual meeting of stockholders in 2024 within 13 months of September 19, 2023;

g.      Enjoining all shares acquired through the PIPE from voting in any director election at the 2024 annual meeting of Forte's stockholders;

h.      Awarding damages in an amount to be determined at trial;

i.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney fees and expenses; and

j.      Granting such other and further relief as the Court deems just and proper.

MELUNEY ALLEMAN
& SPENCE, LLC

OF COUNSEL:

_/s/ William M. Alleman, Jr._

Aaron T. Morris
Andrew W. Robertson
**MORRIS KANDINOV LLP**
305 Broadway, 7ᵗʰ Floor
New York, NY 10007
(212) 431-7473
aaron@moka.law
andrew@moka.law

William M. Alleman, Jr. (#5449)
Matthew D. Beebe (#5980)
1143 Savannah Road, Suite 3-A
Lewes, DE 19958
(302) 551-6740

*Attorneys for Plaintiff*

Dated: October 20, 2023

## **CERTIFICATE OF SERVICE**

I, William M. Alleman, Jr. hereby certify that on October 27, 2023, I caused

a true and correct copy of the foregoing public version of the *Verified Amended Class*

*Action and Derivative Complaint* to be served upon the following counsel of record

by File & Serve*Xpress*:

Brad D. Sorrels, Esq.
Shannon E. German, Esq.
Kaitlin E. Maloney, Esq.
Nora M. Crawford, Esq.
Jeremy W. Gagas, Esq.
WILSON SONSINI GOODRICH & ROSATI P.C.
222 Delaware Avenue, Suite 800
Wilmington, DE 19801
(302) 304-7600

 */s/ William M. Alleman, Jr.*
William M. Alleman, Jr. (#5449)